4

Judge Hellerstein

10 CIV 4899

203-10/PJG/EJC
**FREEHILL HOGAN & MAHAR, LLP**
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski
Edward Carlson



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JADE NAVIGATION S.A.

              Plaintiff

  - against -

TRANSFIELD ER CAPE LIMITED,

              Defendant.

10 Civ. _____

**VERIFIED COMPLAINT**

Plaintiff Jade Navigation S.A. ("Jade"), by its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant Transfield ER Cape Limited ("Transfield"), alleges as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party, and thus falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.  The Court also has federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

## THE PARTIES

1.      At all times material hereto, Plaintiff Jade was and still is a business entity duly organized and existing under the laws of Liberia, with an agent and manager in care of Alpha Tankers and Freighters International, at P.O. Box 75181, 354 Syngrou Ave. Athens, Greece.

2.      At all times material hereto, Defendant Transfield was and still is a business entity organized and existing under the laws of the British Virgin Islands ("BVI") with an address in care of a corporate agent Portecullis Trustnet (BVI) Ltd., Ellen Skeleton Building, 4th floor, Road Town, Tortola, British Virgin Islands.  Transfield, although having previously registered to do business in New York, recently revoked its registration as well as its agent for service of process, and thus has no presence in the Southern District of New York for the purpose of Rule B.

## THE NATURE OF THE CLAIMS

3.      Pursuant to a charter party dated August 7, 2006, on an amended NYPE 1946 Form, with rider, Jade, in the capacity as owner, let the M/V MARIA A. ANGELICOUSSI to Transfield, as charterer, for a time charter period of a minimum of 59 to a maximum of 61 months (the "Charter").  A copy of the Charter is attached hereto as Ex. 1 and incorporated by reference herein.

4.      Pursuant to the Charter, Transfield was obliged to pay hire at the daily rate of USD $40,000 during the initial period of the Charter and thereafter at the daily rate of $37,500 for the remaining balance of the contract's term.

5.      On July 20, 2006, Jade duly delivered the M/V MARIA A. ANGELICOUSSI into the service of Charterer Transfield, and the vessel has performed pursuant to the terms of the Charter.

6.      In February and March this year, and in breach of the terms of the Charter, Transfield made several wrongful deductions totaling $635,238.23 from the 87th and 88th hire payments in respect to nine voyages previously performed under the Charter between January and November 2009, and has made a further wrongful deduction of $77,039.13 from the 90th hire payment due in respect of voyage 13 performed in February and March this year.

7.      The aforementioned deductions were wrongful and in breach of charter, and Jade has good and meritorious claims for breach and recovery of its damages in the form of payment for the amounts Transfield wrongfully deducted from the hire due.

8.      A copy of Jade's most recent hire statement is attached as Ex. 2, which reflects the claim for the wrongful deductions totaling $712,277.36 referenced at paragraphs 8-9 above (the freight statement showing an outstanding total balance of $750,944.66, with the $712,277.36 wrongfully deducted being reflected by the sums of $635,238.23 and $114,643.27, as indicated).

9.      Despite due demand, Transfield has declined and/or refused to pay any of the amounts outstanding, and the full balance of $712,277.36 remains due and owing to Jade.

10.     As a result of this ongoing and continuing breach of the Charter, Plaintiff Jade has commenced arbitration proceedings against Transfield in London, and Jade specifically reserves its right to proceed with its claim in that forum.  Both sides have each appointed an arbitrator, and Transfield has confirmed this matter is subject to arbitration and to be determined in that forum, subject only to a further clarification regarding whether the claims will be determined under LMAA Rules (2006) (London Maritime Arbitrators Association) or pursuant to the LMAA Small Claims Procedure in view of the nature of the claims involving performance.

11.     Inasmuch as the Charter provides for arbitration in London as governed by English law, Jade will be entitled to an award on the principal claim plus interest, the arbitrator's

fees and legal costs, which are routinely awarded to the prevailing party in arbitration and litigation in England. Jade estimates, as nearly as can be computed, that it will be entitled to and recover an award in this matter in the following amounts:[1]

| | | | |
|---|---|---|---|
| (1) | Principal claim for non-payment of hire | | $712,277.36 |
| (2) | Interest calculated at the rate of 6% for an estimated period of 18 months between the making of the deductions and the enforcement of an award | | $64,100.00 |
| (3) | Arbitrator's fees and legal costs | | $90,000.00 |
| | Total: | | $866,377.36 |

## ATTACHMENT IN AID OF ARBITRATION

12.    Plaintiff Jade brings this action to obtain security in its favor in respect to its claims against Defendant Transfield and in aid of the London arbitration proceedings, with Jade specifically reserving its right to arbitrate the underlying claims in that forum.

13.    This action is further brought to obtain security for the additional sums that are recoverable as part of Plaintiff's claims, including Plaintiff's anticipated attorneys' fees, and arbitrators' fees and costs, and interest, all of which are routinely awarded in London maritime arbitration matters, and described in detail above.

14.    After investigation, Defendant Transfield cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims. Plaintiff has however learned that Defendant Transfield has property located within this District, specifically funds in an escrow account at JPMorgan Chase (the funds held in connection with another action filed by Front Carriers against Transfield bearing Civil Action No. 07 Civ. 6333

---

[1] Jade reserves the right to amend its complaint to add any additional claims that may accrue subsequent to the filing of this action.

(RJS)) and/or in the possession or control of the attorneys handling that action including but not limited to Holland & Knight; Chalos, O'Connor & Duffy and/or Lennon, Murphy Caulfield & Phillips, which, if released, will be promptly removed from the jurisdiction by Transfield and placed beyond the reach of its creditors, such as Jade.

15.     Based on the foregoing, Plaintiff Jade submits that Transfield currently maintains property in this district and is entitled to an attachment in aid of arbitration pursuant to Rule B.

WHEREFORE, Plaintiff Jade prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendant Transfield citing it to appear and answer the foregoing;

b.      That if Defendant Transfield cannot be found within this District pursuant to Supplemental Rule B, property of Defendant Transfield up to and including **$866,377.36** be restrained and attached, including, but not limited to, any cash, funds, escrow funds, credits, debts, or securities within the possession, custody or control of JP Morgan Chase, including but not limited to funds held in escrow in connection with Civil Action No. 07 Civ. 6333 (RJS);

c.      That this Court retain jurisdiction over the matter for any further relief or subsequent enforcement action as may be necessary; and

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
      June _23_, 2010

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiff
                              JADE NAVIGATION S.A.

                              By: _____
                                   Peter J. Gutowski
                                 Edward J. Carlson
                                 80 Pine Street
                               New York, NY  10005
                               (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                  ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
23 day of June 2010

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

353568.1

# Ex. 1

2ND ORIGINAL



# Time Charter

### GOVERNMENT FORM
*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in London ........................................ 7th day of August ................19. 2006

2 Between JADE NAVIGATION S.A. .........................................................................

3 Owners of the good ....Greek flag........ Steamship/Motorship ."MARIA A ANGELICOUSSI"........ at (Vessel description - See CL 29)

4 of ..Description of vessel - see Clause 29 tons gross register, and ................ tons net register, having engines of .............. indicated horse power.

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed .........................................................

6 at ............... of about ............... cubic feet bale capacity, and about ............... tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of ............... feet ............... inches on ............... Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ............... tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about ............... knots on a consumption of about ............... tons of best Welch coal - best grade fuel oil - best grade Diesel oil.

11 now trading ..............................................................................................................

12 ............... and ..TRANSFIELD ER CAPE LIMITED.................. Charterers of the City of B.V.L .........................

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

about *minimum 59 months to maximum 61 months Timecharter via safe berth(s), safe port(s), safe anchorage(s), safe*

15 *installation(s) always afloat and within Institute Warranty Limits. See Clause 55* ............... within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. *Acceptance of the vessel shall not constitue any waiver of Charterers' rights under this Charter*

*Party.*

18 Vessel to be placed at the disposal of the Charterers, at *in direct continuation of present Charter Party* .........................

19 .........................................................................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be

22 ready to receive *any permissible* cargo with clean-swept holds *to independent surveyor's satisfaction* and tight, staunch, strong and in every way

fitted for the service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at once and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding *See Clause 55* ...............................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America ............................................................................................. and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic

32 *always safely afloat, always within Institute Warranty Limits - See also Clauses Nos. 51 and 54.* No option to break I.W.L.

33 .........................................................................................................................

34 .........................................................................................................................

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; *also all other charges*

*related to the Master, Officers and crew,* shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage, unless compulsory,*

*which case same to be for Charterers account, lubricating oil* and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment fist and during the service.

39 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*

Pilotages, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48 3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ............... tons and not exceeding .............

50 ............... tons and to be re-delivered with not less than ............... tons and not more than ...............

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 40,000 (Forty Thousand dollars) for the period of*

52 *730 full days from the time of delivery under the new period, then USD 37,500 daily for the balance of period pro rata rata*



*including overtime, payable every 15 days in advance*  United States Currency ~~per ton on vessel's total deadweight-carrying capacity, including bunkers and~~

53 ~~stores, on .......................... summer freeboard, per Calendar Month,~~ commencing on and from the *time* day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *day* *month;* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot or passing Pico safe port South Japan (not North ..*

56 *of Tokyo Bay) and always excluding Japan Sea Side / Singapore range including South Korea, P R China and Taiwan, Indonesia, Malaysia, Philippines or in Charterers' option Skaw/Passero range including UK and Eire or in Charterers' option Aden/Muscat Southbound range, any time day or night, Sundays and Holidays included.* . unless otherwise mutually agreed. ~~Charterers are to give Owners not less than ....................................................................................................................................... days~~

57 ~~notice of vessels expected date of re-delivery, and probable port.~~

58 5. Payment of said hire to be made in *See Clause 30* New York in cash in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *vessel's delivery.*~~7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, *unless authorised*

66 *and approved by Owners,* subject

67 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

68 of such advances.

69 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely lie aground.~~

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers so far as accommodations allow, Charterers~~

74 ~~paying Owners .......................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ No passengers allowed.

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and *equipment.*

77 ~~boats.~~ The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or is to*

78 *authorise Charterers' Agents to sign* Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. ~~Charterers paying at the~~

84 ~~rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally~~

85 ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualing.~~ *See Clause 66*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of .......................................................................................~~

92 ~~..............................................................................................................................................................................................................................~~

93 ~~on giving written notice thereof to the Owners or their Agents .......................... days previous to the expiration of the first named term, or any declared option.~~

94 14. That if required by Charterers, time not to commence before *See Line 18* .......................................................................... and should vessel

95 not have given written notice of readiness on or before .......................................................................... ~~but not later than 4 p.m.~~ *basis local time.* Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97 15. That in the event of the loss of time from deficiency, *sickness, strike, accident or default of Master, Officers or crew or deficiency of*

men or stores, fire, breakdown or damage to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all expenses directly relating to the vessel incurred including bunkers consumed during period of suspended hire shall be for Owners' account,* and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra expenses shall be deducted from the hire *upon completion of vessel's employment and with all relevant log abstracts received by Charterers.*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute *howsoever based* shall be referred to three ~~persons at~~

*London* ~~New York,~~

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of *the umpire* ~~any two of them,~~ shall be final, and for



109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *conversant with shipping*
*matters. (See Arbitration Clause). English Law to apply in both substance and procedure.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. *In case of property Owners and Charterers to share equally return of salvage.* General Average shall be adjusted, stated
and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116 York-Antwerp Rules *1974 as amended 1994 in London 1974,* ~~at such port or place in the United States as may be selected by the carrier, and as to~~
~~matters not provided for by those~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~

126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
1'~~ships belonged to strangers.~~ *General Average, if any, to be in London. English Law to apply.*

13. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire, *to be for Owners' account.* ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to~~
~~quantity, and the~~

134 cost of replacing same, to be allowed by Owners.

135 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138 .......................................................................................................................................
139
'140 22. Owners shall ~~maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 providing ropes, *equipment,* falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide~~
~~necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *free of expense sufficient*
*electric lighting with vessel's light clusters to permit work at hatches and over board at the same time.* ~~Lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.

145 23. Vessel to work 'night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for those engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc." In respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clause, ~~both~~
1' ~~of which is~~ are to be included in all bills of lading issued hereunder.

15. U. S. A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160 ~~Both-to-Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots,* insurance, crew, and all other matters, same as when trading for their own account.



172    27. A commission of 2-1/2 *1.25* per cent is payable by the Vessel and Owners to *E.A. Gibson Shipbrokers Limited, London*
173    ................................................................................................................................................................................
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175    28. An address commission of 2-1/2 *3.75* per cent payable to ..... *Charterers* .................................. on the hire earned and paid under this Charter.

*Clauses 29 to 86 as attached hereto, to be fully incorporated in this Charter Party.*

**OWNERS:**                                                    **CHARTERERS:**

By Authority from Owners, through          ..... on behalf of
ALPHA TANKERS & FREIGHT INTERNATIONAL LTD., ATHENS          Brousfield ER Cape Limited
Agelef Shipping Co. (London) Ltd.

As Agents Only                                               *Authorised Signature(s)*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



# " MARIA A. ANGELICOUSSI "
## All Details "About"

1

**Updated 20th July, 2006.**

## 1.   GENERAL

| 1.1 | Vessel's Name | Maria A. Angelicoussi |
|---|---|---|

| 1.2 | Vessel's Previous Name(s) | N/A |
|---|---|---|
| | Date(s) of Change | |

| 1.3 | Flag | Greek |
|---|---|---|

| 1.4 | Month/ Year Built | November, 2001 |
|---|---|---|
| | Where Built | South Korea |

| 1.5 | Yard Name | Samho Heavy Industries |
|---|---|---|
| | Number | H 1100 |

| 1.6 | Official Registration No. | 10939 |
|---|---|---|
| | IMO/ LR No. | 9233703 |
| | Other | |

| 1.7 | Port of Registry | Piraeus/ Reg. No. 10702 |
|---|---|---|

| 1.8 | Owners' Full Style | Jade Navigation S. A. |
|---|---|---|

| 1.9 | Manager's Full Style | Alpha Tankers & Freighters International Ltd., |
|---|---|---|
| | Contact Nos. for Operational purposes, if appropriate | c/o Agelef Shipping Co. (London) Ltd., Manning House, 22 Carlisle Place, London. SW1P 1JA<br>Tel:    + 44 20 7828 3388<br>Fax:    + 44 20 7828 0070 |



# " MARIA A. ANGELICOUSSI "
## All Details "About"

2

## 2.    PARTICULARS OF VESSEL

| 2.1 | Type of vessel | Bulk Carrier |
|---|---|---|

| 2.2 | Deadweight all told (Metric Tons) | DWAT | DRAFT | TPC BASIS FULL DRAFT |
|---|---|---|---|---|
| | Summer | 169,163 | 17.652 | 118.37 |
| | Winter | 164,826 | 17.285 | |
| | Tropical | 173,513 | 18.019 | |
| | Fresh | 169,172 | 18.057 | |
| | Tropical Fresh | | | |

| 2.3 | Is vessel fitted for transit of: | |
|---|---|---|
| A. | Panama Canal | N/A |
| B. | Suez Canal | Yes |
| C. | St. Lawrence Seaway | N/A |

| 2.4 | GT/ NT | |
|---|---|---|
| | International | 86,201/ 56,565 |
| | Suez | 83,846.62 (subject to re-measurement by Suez Canal Authorities) |
| | Panama | |
| | British | |

| 2.5 | Length overall     (Metres) | 288.97 |
|---|---|---|

| 2.6 | Length between Perpendiculars     (Metres) | 278 |
|---|---|---|

| 2.7 | Extreme breadth     (Metres) | 44.98 |
|---|---|---|
| | Depth moulded     (Metres) | 24 |

| 2.8 | Distance (Metres) from waterline to top of hatch coamings basis 1,000 MT IFO + 120 MT MDO bunkers | | | |
|---|---|---|---|---|
| | | Ballast Condition (Ballast holds not flooded) | Full ballast condition (Ballast hold No. 4 flooded) | Light condition, no cargo, port ballast only, No. 4 full, 2-8 half full |
| A. | No. 1 hatch | | | |
| B. | Midships | | | |
| C. | Last hatch | | | |

# " MARIA A. ANGELICOUSSI "
## All Details "About"

3

| 2.9 | Distance (Metres) from keel to top of hatch covers | |
|---|---|---|
| A. | No. 1 hatch | |
| B. | Midships | 27.20 |
| C. | Last hatch | |

| 2.10 | Vessel's ballasting and Deballasting time | 15 hours and 20 hours |
|---|---|---|

| 2.11 | Distance (Metres) from keel to highest point of vessel | 55 |
|---|---|---|

| 2.12 | Capacity of: | |
|---|---|---|
| A. | Ballast tanks | 54,180 MT |
| B. | Ballast holds capacity (state which hold(s) | 22,728 MT   No. 6 |

| 2.13 | Constants, including Freshwater | 1,500 MT |
|---|---|---|
| | Daily freshwater consumption | |
| | Fresh water capacity | 481.8 MT |
| | State capacity and daily production of evaporator | |
| | Normal fresh water reserve | |

| 2.14 | Vessel is fitted with shaft generator | Yes |
|---|---|---|

| 2.15 | Vessel's on board electrical supply (.220V/ 60Hz) | |
|---|---|---|

## 3.    CARGO ARRANGEMENTS

| 3.1 | Holds | |
|---|---|---|
| A. | No. of holds | 9 |
| B. | Are vessel's holds clear and free of any obstructions? | Yes |
| C. | Grain/ Bale capacity in holds excluding hatchways, wing/ top side tanks (M3) | 186,769 |

# " MARIA A. ANGELICOUSSI "
## All Details "About"

4

| | | | | | |
|---|---|---|---|---|---|
| D. | Grain/ Bale capacities by hold excluding wing/ top side tanks but including hatchways (M3) | [1]  19,463.4 | | [6]  21,192.7 | |
| | | [2]  21,165.6 | | [7]  21,285.4 | |
| | | [3]  21,256.2 | | [8]  21,065.5 | |
| | | [4]  21,256.2 | | [9]  18,920.4 | |
| | | [5]  21,163.6 | | | |
| E. | Is vessel strengthened for the carriage of heavy cargoes? | Yes | | | |
| | If "Yes", state which holds May be left empty | Nos. 2, 4, 6 and 8 | | | |
| F. | Is tank top steel and suitable for grab discharge? | Yes | | | |
| G. | State whether bulkhead Corrugations vertical or horizontal | Vertical | | | |
| H. | Tank top strength (Metric Tons per Sq. M.) | | | | |
| I. | Are holds CO2 fitted? | No | | | |
| J. | Are holds fitted with smoke detection system? | No | | | |
| K. | Is vessel fitted with Australian type approved holds ladders? | Yes | | | |
| L. | Has vessel a functioning class certified loadmaster/ loadicator or similar calculator? | Yes | | | |
| M. | Are holds hoppered at: | | | | |
| | Hold side | Yes | | | |
| | Forward bulkhead | Yes (except No. 1) | | | |
| | Aft bulkhead | Yes (except No. 9) | | | |
| | Can vessel's holds be described as box shaped? | No | | | |
| N. | Measurement of any tank slopes/ hoppering (height and distance from vessel's side at tank top) (Metres) | | | | |
| O. | Flat floor measurement of cargo holds at tank top (Metres) | | | | |
| P. | Are vessel's holds electrically Ventilated? | No | | | |

| 3.2 | Deck and Hatches | |
|---|---|---|
| A. | No. of hatches | 9 |
| B. | Make and type of hatch Covers | MacGregor Steel Side Rolling |

EA GIBSON

# " MARIA A. ANGELICOUSSI "
## All Details "About"

5

| | | | |
|---|---|---|---|
| C. | Hatch sizes (Metres) | [1]      15.66 x 16.50<br>[2-9]   15.66 x 20.00 | |
| D. | Strength of hatch covers<br>(Metric Tons per Sq. M.) | 1.75 | |
| E. | Distance from ship's rail to<br>near and far edge of hatch<br>covers/ coaming near and<br>far (Metres) | 12.3 and 32.7 | |
| F. | Distance from bow to fore of<br>first hold opening (Metres) | 24 | |
| G. | Distance from stern to aft of<br>last hold opening (Metres) | 47.10 | |
| H. | Distance forward No. 1 to Aft<br>No. 9 | Workable length 217.90 M | |

| | | |
|---|---|---|
| 3.3 | State deck strength (Metric<br>Tons per Sq. M.) | |

## 4.    SPEED/ CONSUMPTION/ FUEL ENGINE

| 4.1 | Vessel's speed/ consumption on the basis up to Beaufort Scale Force 4 / Douglas Sea State 3 (3-5 ft) / / Good weather conditions, which are understood to mean wind speeds of Beaufort Force 4 (max 16 knots) and total combined (sea and swell) significant wave height confined to limits of Douglas Sea State (3-5 feet) with no adverse currents. | | |
|---|---|---|---|
| | | About Metric Tons<br>(main engine) | About Metric Tons<br>(auxiliaries) |
| A. | Laden about 14.5 kt | Abt 58 MT IFO380 cSt | No diesel at sea |
| B. | Ballast about 15.0 kt | Abt 58 MT IFO380 cSt | No diesel at sea |
| | Ballasting / deballasting (in<br>port or at sea) | Additional abt 2.1 MT DDO | |
| | Some DDO when manoeuvring in confined/ restricted/ congested waters | | |

| 4.2 | Bunker grades | In accordance with ISO 8217:2005 (E) |
|---|---|---|
| | IFO | RMG 380 |
| | DDO | DMB within ISO 8217:2005 (E) |

| 4.3 | Permanent bunker capacities basis 100 pct capacity: | |
|---|---|---|
| | IFO | 4,750 MT |
| | MDO | 186 MT |

# " MARIA A. ANGELICOUSSI "
## All Details "About"

6

| 4.4 | Port consumption per 24 hours (Metric Tons) | Abt 1 MT IFO + abt 1.8 MT DDO |
|---|---|---|

| 4.5 | Engine make and type | Hyundai B & W 6 S 70 MC (Mk VI) |
|---|---|---|

| 4.6 | Max output BHP/ RPM | 22,920 BHP/ 91 rpm |
|---|---|---|
|  | NCR | 19,480 BHP/ 86.2 rpm |

## 5.    CLASSIFICATION SOCIETY, SURVEYS AND CERTIFICATES

| 5.1 | Name of Classification Society | Bureau Veritas |
|---|---|---|

| 5.2 | Date of last special survey | |
|---|---|---|

| 5.3 | Date of last annual survey | N/ A |
|---|---|---|

| 5.4 | Is vessel entered in Classification approved enhanced survey programme | Yes |
|---|---|---|
|  | Date of last inspection | |
|  | Date of next inspection | |

| 5.5 | Does vessel comply with IACS unified requirements regarding No. 1 cargo hold and double bottom tank steel structure?    (Yes/ No) | |
|---|---|---|

| 5.6 | Date and place of last drydock | N/ A |
|---|---|---|

| 5.7 | Has vessel been involved in any groundings or collision in the last 12 months? | No |
|---|---|---|
|  | If so, give full details | |

| 5.8 | Is vessel ISM Certified? | Yes |
|---|---|---|



# " MARIA A. ANGELICOUSSI "
## All Details "About"

| 5.9 | Is vessel's crew covered by full ITF or bona fide Trade Union Agreement acceptable to ITF? | Yes |
|---|---|---|

| 5.10 | Has vessel an ITF Agreement? | Yes |
|---|---|---|

## 6.    COMMUNICATIONS

| 6.1 | Call Sign | S W U K |
|---|---|---|
| | Email | Mail.MariaAAngelicoussi@telaurus.net |

## 7.    INSURANCES

| 7.1 | Hull and machinery insured value | US$ 78,900,000 |
|---|---|---|

| 7.2 | Name of Owners' P & I Club | North of England Protecting & Indemnity Association Limited |
|---|---|---|

| 7.3 | Where is Owners' Hull and Machinery placed? | Multitudinous International |
|---|---|---|

## 8.    CREW

| 8.1 | No. of crew | 20 |
|---|---|---|

| 8.2 | Nationality of Master | Greek |
|---|---|---|

| 8.3 | Nationality of Officers | Greek |
|---|---|---|

| 8.4 | Nationality of crew | Philippino |
|---|---|---|

RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7ᵀᴴ AUGUST 2006

30.    Hire:

Hire and bunkers payable to:

> THE ROYAL BANK OF SCOTLAND
> PIRAEUS BRANCH
> ACCOUNT NO. 246554 USD 100
> IBAN GR 15 0640 0010  0000 0024 6554 100
> FOR ACCOUNT OF JADE NAVIGATION S.A.

31.

Referring to Lines 60 and 61 where there is any failure to make 'punctual and regular payment' due to oversight or negligence or error or omission of Charterers' employees, bankers or Agents, Owners shall notify Charterers in writing whereupon Charterers will have three banking days to rectify the failure, where so rectified, the payment shall stand as punctual and regular payment.

32.

Charterers to have the right to withhold from Charter hire, during the period of this Charter, such amount due to off-hire and Owners' disbursements, but properly substantiated and agreed. Charterers to have the right to withhold from last hire payment Owners' estimated disbursements maximum USD 5,000 or against Agents' or telex, including any fines and any other accounts for Owners' account and also the value of the estimated quantity of bunkers on redelivery. However, final accounting and settlement to be arranged by Charterers within 3 months.

33.

The vessel is Greek flag, the terms and conditions under which vessel's Officers and crew are employed are in accordance with the Greek Collective Agreement and/or bilateral agreements. In the event of vessel being boycotted, delayed or by strikes, labour stoppages or any other difficulties due to non-compliance with the above or age, Ownership or any other vessel under the same ownership, operation or control, all time lost to be considered as off-hire and any extra direct expenses incurred which are directly relating to the vessel to be for Owners' account.

34.

Should the vessel be seized or detained by any authority or arrested at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra direct expenses and consequential actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their Agents, or by reason of cargo carried.



RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

35.

Any delay, direct expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers or by Charterers' servants, and to be for Owners' account if caused by Master, Officers, crew or Owners' servants.

36.

Any delays, direct expenses or consequential loss by reason of non-compliance with regulations, lack of proper documentation or equipment as per Clauses 29 and 45 to 48 or on any breach of said Clauses to be for Owners' account.

37.

Charterers to pay hire as agreed.

38.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 48 or because of lack of said certificates, any time so lost shall be treated as off-hire. Directly related extra expenses resulting from such failure, shall be for Owners' account.

39.

Should the vessel deviate except for the purpose of saving life or in an emergency or out back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off-hire shall be for Owners' account.

40.

If for any reason whatsoever the vessel will be off-hire or is reasonably estimated to be off-hire for 30 (thirty) days, Charterers have the option to cancel the balance of this Charter Party provided vessel has no cargo on board.

41.

Hire as specified in Line 51 to include among other operations usually performed by the crew unless prohibited by shore regulations such as:

-   Opening and closing of hatches

-   Watchmen on deck for supervision of loading and discharging





### RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
### CHARTER PARTY DATED 7TH AUGUST 2006

- Docking/undocking/shifting/ballasting and bunkering
- Shape up hatches/holds as much as possible prior to arrival at loading and/or discharging port/docks/anchorages, as far as weather permits

Watchmen on cargo to be for Charterers' account, gangway watchmen on vessel to be for Owners' account, but where compulsory to employ and pay gangway watchmen from shore, the expenses to be for Charterers' account.

42.    Bunker Clause:

Bunkers on delivery to be about 2,700 to about 2,800 MTS IFO and about 160 to about 180 MTS DDO. Bunkers on redelivery to be similar quantities as on delivery, but DDO to be as on board but minimum 100 MTS. Prices same both ends: USD 360.00 per MT for IFO and USD 670.00 per MT for DDO.

Charterers and/or Owners have the right to bunker vessel prior delivery/redelivery, provided same not interfering with operations.

### BUNKER CLAUSE

Throughout the currency of this charter, Charterers shall supply the vessel with homogeneous blends of fuel which must always be fit for purpose such that the vessel can safely burn same in the main engine and auxiliaries, always within ISO 8217:2005 (E) standards and MARPOL 73/78 Annex VI requirements, and any subsequent amendments thereof in countries where ratified.

Vessel to be supplied with the following grades of bunkers:

IFO : RMG 380 specification .
DDO: (Distillate diesel oil) to DMB specification.

If specific grades of IFO or DDO are not available, Charterers must give Owners adequate prior notice of any substitute available grade of fuel and advise full specification for approval /acceptance.

If bunkers supplied by Charterers are not in any respect compliant with above specification and/or are unfit for purpose such that they are not suitable for burning in the main engine or auxiliaries, Owners shall not to be responsible for vessels performance and shall be released from any performance warranty under this charter until such time as all non compliant and/or unfit bunkers have been removed from the vessel. Furthermore, Charterers hereby indemnify and hold Owners harmless in respect of all proven engine/ purification system and/ or mechanical damage, deviation, repair costs, losses, liabilities, expenses, delay or fines of whatsoever nature which Owners may suffer or incur arising from or in connection with the supply to the vessel by the Charterers of non compliant or unfit bunkers.

Resolution of any dispute between Owners and Charterers as to whether the bunkers supplied are compliant with the above specification to be determined, on a shared cost basis, by a mutually agreed analyst (in the event that the parties fail to agree within seven (7) days of one party's request, upon the



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"**
**CHARTER PARTY DATED 7TH AUGUST 2006**

identity of such analyst, either party may apply to the current President of the LMAA to make such appointment, whose decision shall be binding on both parties) on the basis of their analysis of sealed bunker samples (from ship's manifold). In the event that such analysis establishes the fuel is unfit for purpose and where engine/ purification system and/ or mechanical damage is involved or performance seriously affected, further testing of parameters beyond the scope of normal fuel analysis shall be performed by the mutually agreed analyst whose findings as to whether the bunkers are compliant with the above specification shall be conclusive evidence of compliance or otherwise (with the requisite specification) of the bunkers supplied and such findings shall be binding on both parties, the cost of which to be equally shared between Owners and Charterers.

If Charterers arrange/ supply bunkers at a port/ country that has not ratified the MARPOL 73/ 78 convention, or any subsequent amendments thereof, they will ensure the supplier fully complies with sampling procedures and issues all relevant documentation required by MARPOL 73/ 78 Annex VI, failing which, the Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from this non-compliance.

Owners have liberty to bunker the vessel for their own account at Charterers' final bunker port or discharge port prior to redelivery providing such bunkering does not interfere with Charterers' operation.

Charterers have a right to deduct the value of estimated bunkers remaining on board on redelivery from last sufficient hire(s) payment(s). The estimated value of bunkers upon redelivery to be deemed an advance against hire and shall not be subject to commission.

**BUNKER EMISSION CONTROL CLAUSE**

(a)    Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.



RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

(b)    For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI (and any amendment thereto) and/ or zones regulated by regional and/ or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

43.

Charterers have the option to bunker vessel prior to delivery provided this does not interfere with Owners' normal operations. Similarly, Owners have the option to bunker the vessel during the Charter provided same does not interfere with Charterers' operation.

44.

Owners warrant that vessel is eligible and equipped to bunker in the USA, its territories and possessions and in all countries to which vessel is allowed to trade under this Charter.

45.    Certificates/Warranties:

The Owners are to provide and keep on board valid deratisation and fumigation certificates throughout the Charter period. Deratisation shall always be for Owners' account.

46.

Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations, and all current requirements at all ports of call, Suez Canal included.

47.

Vessel to be fit for grab discharge and no cargo to be loaded in places inaccessible to grabs or in deeptanks.

Charterers to have the privilege of using bulldozers in vessel's holds. However, unit weight of bulldozers will not exceed vessel's tanktop strength and Charterers to employ rubber wheeled vehicles where possible.

Charterers are allowed to place mobile crane on deck to facilitate discharge operations in accordance with attached Mobile Crane Clause.

Charterers to be responsible for any rain damage to cargo if hatches are obstructed by equipment and prevented from being closed.



RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

48.

The Owners undertake that all equipment shall conform with regulations in all ports visited by the vessel and that the vessel is at all times in possession of valid certificates to comply with such regulations.

49.

To the best of the Owners' knowledge the vessel has not traded to Israel and is not blacklisted by Arab countries.

50.    Oil Pollution Clause:

1.    Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:-

    a)  Certificates issued pursuant to Section 311(p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code, Section 1321 (p) up to (insert the date upon which such certificate(s) is/are due to expire)

    b)  Certificates issued pursuant to Section 1016(A) of the Oil Pollution Act 1990, and Section 108(A) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (insert the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes, for example SIGCO).

2.    Notwithstanding anything whether printed or typed herein to the contrary:-

    a)  Save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

    b)  Charterer shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirements to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

    c)  Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued



RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3.   Charterers warrant that the terms of this Clause will be incorporated effectively into all Bills of Lading issued under this Charter.

51.

In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, C.I.S., Communist China, United Kingdom, Japan, France, Germany, Belgium, Greece, both Charterers and Owners have the option of canceling this Charter Party.

It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of limited local conflict.

52.

The basic war risk insurance premium on the vessel's hull and machinery value and present war bonus to the Master, Officers and crew are for Owners' account, but any increase or additional premium including crew war bonus including blocking and trapping insurance premium of same due to vessel's trading into an excluded area to be for Charterers' account.

53.   Bill(s) of Lading/Cargo Claims:

All Bills of Lading issued under this Charter will incorporate the General Paramount Clause as attached.

<u>P. and I. Bunkering Clause</u>

The vessel shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

54.   Trading Exclusions:

Worldwide trading within Institute Warranty Limits, excluding the following:

Any declared war or warlike zone or any areas included in Owner's Underwriters' war risk trading warranties as amended from time to time and any countries where sanctions have been imposed or are imposed during the currency of this Charter Party.



### RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
### CHARTER PARTY DATED 7TH AUGUST 2006

Yugoslavia and states/ areas formally constituted same (but Bakar, Plomin and Koper are allowed), Albania, Turkish Occupied Cyprus, Turkish ports where Greek flag vessels are prohibited, Sea of Azov, Syria, Lebanon, Iraq, Israel, Libya, Senegal, Gambia, Guinea Bissau, Liberia, Ivory Coast, Ghana, Togo, Benin, Nigeria, Cameroon, Equatorial Guinea, (but Port Kamsar allowed), Gabon, Congo, Cabinda, Zaire, Angola, Madagascar, Necochea, Somalia, Sudan, Syria, Ethiopia, Djibouti, North of Bandar Khomeni, Myanmar (Burma), Kampuchea, Nicaragua, Sierra Leone, Sri Lanka, North Korea, CIS Pacific Ports, Vietnam, Yemen, Alaska, Bangladesh, Cambodia, Cuba, Haiti, Great Lakes, River Orinoco, Amazon River, areas where Gypsy moth infestation may occur, no direct trade between PRC and ROC, Murmansk allowed only with Owner's prior approval and subject always to prevailing and expected weather conditions.

Charterers have the option to trade the vessel via Cape Horn (or via Magellan Strait if required by Owners/ Master due to adverse weather conditions.  However, during the period 1st July to 31st October Charterers may only order the vessel to transit through Magellan Strait.  All pilotage costs to be for Charterers' account.

55.    Permitted Cargoes:

Cargo for this Charter Party to be iron ore only, lump, pellets or fines always excluding DRI/DRIP/HBI/SPONGE IRON and concentrates.  Coal in bulk to be of a type having a history of shipment under similar circumstances without problems arising from methane emission or spontaneous heating "which to be of a type not having a history"

Cargo to be always loaded/stowed/carried in accordance with IMO recommendations and local regulations.
Cargo is to be loaded homogeneously in all holds, and Masters instructions to be followed at all times. No alternate hold cleaning.

56.    Redelivery Clause:

Charterers to give Owners 15/10/7 days approximate redelivery notice and port and 5/3/1 days definite notice and port.

57.    Drydock Clause:

Owners have the option to dry dock the vessel during the currency of this Charter Party at a time and place nominated by Owners for bottom cleaning and painting and/ or repair as required by Class or dictated by circumstances.  Charterers to undertake to use their best endeavours to schedule the vessel to an area as close as possible to Owners' nominated dry dock.  Payments of hire shall be suspended upon deviation from Charterers' service until vessel is again placed at Charterers' disposal at a point equidistant and not less favourable to Chartererers than when the hire was suspended.

Owners to give at least ninety (90) days notice of their drydocking intentions/ arrangements.



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"**
**CHARTER PARTY DATED 7TH AUGUST 2006**

58.    Stevedore Damage Clause:

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for all damage to
the vessel caused by stevedores provided the Master has notified the Charterers and/or their Agents in
writing as soon as practical but no later than forty eight (48) hours after occurrence. Such notice to
specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such
damage. Hidden damages to be reported immediately upon discovery.

The Master shall endeavour to obtain written acknowledgement by the party causing the loss or
damage unless it is made good in the meantime. The Charterers shall pay for properly reported
stevedore damage(s) whether or not payment has been made by stevedores to the Charterers.

A)    In case of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the
crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately
arrange for repair of such damage(s) at their expense and the vessel to remain on-hire until
such repairs are completed and if required passed by the vessel's Classification Society.

B)    Any time for repairing outstanding stevedore damage(s) not described under point (A) which
cannot be completed during Owners' occasional repair works or drydocking time shall be for
Charterers' account as well as (if applicable) all costs for vessel's Classification Society
surveyor.

Stevedores shall be employed at Charterers' risk and paid for by the Charterers. It is understood that if
agreed between Charterers and Owners that crew are to assist stevedores with cargo operations, the
crew members are to be considered Charterers' servants in respect of stevedore damage(s) only.

59.

Hire to be calculated in GMT and lay/can in local time.

60.

Owners to appoint Owners' Agents to attend all Owners' matters. Owners may utilize the services of
the same Agents as Charterers but Owners shall remain responsible for making cash advances to
Agents and arranging fees with such Agents.

61.

No through Bills of Lading are permitted during this employment.

Master to sign Bills of Lading for cargo loaded as presented in conformity with Mate's or Tally
Clerk's receipts. If required, the Master shall authorise Charterers and/or their Agents in writing
(Owners' standard format/wording of such letter is to be used) to sign Bills of Lading on
Owners'/Master's behalf in accordance with Mate's and Tally Clerk's receipts.



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"**
**CHARTER PARTY DATED 7TH AUGUST 2006**

Charterers to ensure Bills of Lading arrive in good time for vessel's discharge, failing which if the original Bill(s) of Lading cannot be presented at discharge port, Owners/Master agree to discharge/release the entire cargo without presentation of the original Bill(s) of Lading only against Charterers' Letter of Indemnity in Owners' standard P and I form and without bank guarantee or bank endorsement.

All Bills of Lading issued under this Charter Party to be subject to English Law and London Arbitration.
Also see attached Sea Waybills Clause.

62.     Double Banking

a)      The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/ or bunkering.

b)      The Charterers shall pay for and provide Yokohama fenders and such assistance and equipment as may be required to enable any of the operations mentioned in this clause to be safely completed and shall give the Owners such advance notice as they reasonably can of the details of any such operation.

c)      Without prejudice to the generality of the Charterers' rights under a) and b) it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in a) and b) if, in his reasonable opinion, it is not safe to do so.

d)      The Owners shall be entitled to insure any deductibles under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium (premia) required by the vessel's Underwriters and/ or the cost of insuring any deductible under the vessel's hull policy.

e)      Notwithstanding any other provision of this Charter, the Charterers shall indemnify the Owners for all losses, damages and expenses of whatsoever nature (whether caused in whole or in part by the negligence of the Master of the Vessel and/ or the other officers and crew on board the Vessel) arising from or in connection with any double banking operation performed under this Charter.

63.

On-hire survey at delivery port or Charterers' option first loadport at Owners' time and off-hire survey at discharge port at Charterers' time. Charterers to appoint an independent surveyor for the joint on/off-hire survey and the cost to be split 50/50 between Owners and Charterers.



RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

64.

Vessel's holds on arrival at first load port to be clean/swept/washed down by fresh water and dried and in every respect fit and ready to receive Charterers' intended cargo, being free of loose rust scale and previous cargo residues to the satisfaction of independent surveyors. Should vessel not be ready or approved by relevant surveyors as being fit and suitably clean for Charterers' intended cargo, the vessel to be off-hire from time of rejection until the vessel is fully accepted and any directly related expenses incurred because of rejection and/or whilst vessel off-hire to be for Owners' account.

The holds on redelivery to be clean swept but Charterers have the option to redeliver the vessel with holds as discharged in lieu of which Charterers to pay USD7,500 lumpsum to be cleaned.

65.    Arbitration Clause:

If either of the arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator, either originally or by way of substitution as aforesaid, within 7 (seven) clear days after the other party having appointed his arbitrator has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. If the two arbitrators fail to agree upon an umpire, the President of the London Maritime Arbitrators' Association shall nominate an umpire. Arbitrators to be commercial shipping men.

Notwithstanding anything to the contrary agreed hereinto, any dispute howsoever based arising out of or in connection with this Charter where the principal amount in dispute is less than USD50,000 (United States Dollars Fifty Thousand) shall be referred to arbitration in London in accordance with the LMAA Small Claims Procedure 2002.

66.

Communication/entertainment/victualling expenses on behalf of Charterers to be charged at USD1,500 lumpsum per month or pro rata for first two years then USD2,000 for the following three years.

67.    Prolonged Port Stay Clause:

If the vessel's performance is adversely affected as a result of bottom fouling by reason of the vessel being at anchorage(s) and/or port(s) for accumulative prolonged periods in excess of twenty five (25) days then Owners shall not be responsible for any under performance of the vessel and Charterers shall not claim against Owners in this respect.

If required, the vessel's underwater hull area to be inspected and cleaned if necessary at first available opportunity with such work carried out in Charterers' time and at their risk and expense.



## RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI" CHARTER PARTY DATED 7TH AUGUST 2006

**68.**

The vessel to have the liberty of using diesel oil when entering and leaving port and for manoeuvring in shallow and narrow waters.

**69.**

All cargo claims to be settled in accordance with NYPE Interclub Agreement incorporating latest amendments.

**70.**

Owners permitted to sell vessel to Owners of similar good standing with balance of Charter Party subject to Charterers' prior approval which not to be unreasonably withheld.

**71.**

Any and all taxes and/or dues on cargo and/or freight or sub-Charter hire to be for Charterers' account. Taxes, if any, on Charter hire levied by the country of vessel's registry and/or her Owners' domicile to be for Owners' account.

**72.**

All hatches are to be carefully tended by the crew to prevent leakage.

**73.**

In the event that the vessel does not comply entirely at first load port with such rules and/or regulations and/or surveyors which should be carried out by the relevant authority at the loading port, she is to be placed off-hire from failure of inspection until she will fully comply with such rules and/or regulations and/or surveyors, and any further direct expense and time lost are to be on the Owners' account.

**74.**

Vessel shall comply with the local, national and international regulations regarding water pollution. If any pollution occurs, the time lost and all expenses thus incurred to be for Owners' account even if such pollution takes place during the vessel's bunkering but always provided such pollution is the responsibility of the vessel. However, if pollution is caused by Charterers, their Agents or servants, to be for Charterers' account. Owners warrant that the vessel is fully covered by P + I insurance for pollution liability and will remain so during the currency of the Charter.

**75.**

All negotiations and eventual fixture to be kept strictly private and confidential.





RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006

76.

Owners confirm vessel shall be a member of a P + I Club under this Charter Party.

77.    Performance Clause:

Throughout the currency of this Charter, Owners and Charterers have the option to employ at their own expense a weather routing service to monitor weather conditions during sea passages and assess the vessel's performance.

The Master will comply with Charterers' weather routing services reporting procedures at all times and endeavour to follow Charterers' or their weather routing services recommended route. However, the final choice of selecting the safest route will always be at the Master's discretion.

The vessel's warranted speed and consumption is given in good faith and based upon:

-   Good weather conditions, which are understood to mean wind speeds of Beaufort Force 4 (max 16 knots) and total combined (sea and swell) significant wave height confined to limits of Douglas Sea State 3 (3-5 feet) with no adverse currents.

-   Safe navigation permitting

-   Specification of fuels supplied during the currency of the Charter to be in accordance with the vessel's description and bunker clause.

If required by Charterers, the Master to submit copies of log abstracts for all sea passages. In the event of an alleged under-performance claim, Charterers to produce a detailed performance report from their weather routing service to support a claim and the average/ mean result between this report, Owner's weather routing services' performance report (if appointed) and the Master's log abstracts (actual observations recorded in the ship's log) to be used to amicably settle a claim.

In the case of an unresolved performance dispute, the matter is to be referred to the LMAA small claims procedure for a final decision.

78.

Charterers to instruct terminals to strictly adhere to Master's instructions.

79.

Owners confirm that vessel is ISPS compliant.

**BIMCO ISPS CLAUSE**

(a)     (i) From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure



### RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
### CHARTER PARTY DATED 7TH AUGUST 2006

that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)    (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners"

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

80.    S.A.R.S. Clause:

Normal quarantine time and expenses to enter port shall be for Charterers' account. Any extra time or detention and/or expenses for quarantine due to pestilence and illness of the vessel's Master, officers and crew shall be for Owners' account but if quarantine detention is due to the vessel having been sent by Charterers to an infected port, such detention time and all expenses and consequences shall be for Charterers' account. It is further agreed that the vessel is not to be ordered nor knowingly allowed to trade or continue to ports/areas by Charterers where U.N. and/or the World Health Organisation have either declared and/or warned of the existence or likelihood of contagious disease including S.A.R.S.



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006**

81.

Charterers to have the option of adding any off-hire to period of this Time Charter.

82.

Owners guarantee vessel holding valid Certificate of Financial Responsibility/International Tonnage Certificate during the entire Charter Party period. (Refer name of auditors/IMO/DOC/SMC number — please see Description).

83.

Owners guarantee vessel on delivery to have all usual trading certificates ready on board, otherwise any time lost/extra costs incurred to be for Owners' account.

84.    PROTECTIVES CLAUSE

This Charter Party shall have effect subject to the provisions of the following clauses:

New Jason Clause, General Average Clause, New Both-to-Blame Collision Clause, Conwartime 1993 War Risk Clause, all of which are hereby agreed to be incorporated in this Charter Party. All Bills of Lading issued under this Charter Party shall validly and effectively incorporate all of the above.

**BALLAST DISINFECTION**

Any detergent/disinfectant required by authorities to be added to ballast water prior to ballasting/deballasting tanks or hold spaces within National Territorial Waters of respective countries to be supplied by Charterers at their risk, time and expense.

**ICE CLAUSE**

The vessel not to be ordered to, nor bound to enter any ice-bound place or any whose lights, lightships, marks and buoys are or likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that ordinarily the vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The vessel not to be obliged to force ice, to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any above causes to be for the Charterers' account.

**BUNKER QUALITY CONTROL CLAUSE FOR TIME CHARTERS**

1)    The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engine and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"**
**CHARTER PARTY DATED 7ᵀᴴ AUGUST 2006**

2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the vessel.

4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by DNVPS/FOBAS or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

The cost of such survey to be equally shared between Charterers and Owners.

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

## MOBILE CRANE CLAUSE

Charterers are permitted to place mobile cranes on deck provided the weight of such cranes (including the weight of fully loaded grab) does not exceed the vessel's maximum permissible deck strength. Charterers shall arrange and pay for sufficient dunnage t-bars/ deck bearers and/ or protection plates to be fitted under cranes in order to spread the weight which shall not exceed the vessel's maximum permissible deck strength and same to be removed upon completion of discharge in Charterers' time and at their risk and expense. Should any cutting and/ or welding and/ or reinforcement be necessary to accommodate placement of such cranes as well as the restoration works (including, but not limited to, burned areas of paint on decks and underneath, ship's rail, breakwater, etc.) in order to reinstate vessel's original condition on completion of discharging and before vessel's departure, all costs (including crew wages and overtime), expenses and time for such work to be for Charterer's account.

The specification of the cranes to be used as well as the scope of works to be carried out should be submitted in time, before the actual works commencing, in order to verify satisfaction/ approval of Class Society and vessel's Master.

Charterers shall be fully responsible for any rain damage to cargo directly attributable to hatches remaining open and prevented from being closed. 



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006**

**SEA WAYBILLS CLAUSE**

The Master shall sign Bills of Lading and/or Sea Waybills for cargo as presented in strict accordance with Mate's/Tally Clerk's receipts. However, the Charterers may sign Bills of Lading and/or Sea Waybills on the Master's behalf with Owners' prior written authority, always in accordance with Mate's/Tally Clerk's receipts.

Charterers are permitted to use non-negotiable general Sea Waybills for the purposes of this Charter, always provided the consignees' name and address is entered on the Sea Waybill on issue and the Charterers' instructions is that the cargo is to be delivered to that named consignee. The Sea Waybill to be BIMCO 'Genwaybill' form incorporating The Hague Visby Rules and all clauses of the Charter Party, including the Arbitration London/English Law Clause.

Charterers to use BIMCO 'Genway' bills issued by BIMCO subject to The CMI Uniform Rules for Sea Waybills with the following 'Transfer of Control Clause' incorporated:

'It is hereby noted that the shipper has irrevocably transferred the right of control (of disposal) of the goods to the consignee under Rule 6 (II) of the CMI Uniform Rules for Sea Waybills. The carrier will hold the goods to the order of the consignee subject to any lien in favour of the carrier'.

**CLAUSE PARAMOUNT**

All bills of lading issues under this charter shall include the following clause.

1)    This bill of lading shall be governed by, and have effect subject to the international convention of the unification of certain rules relating to bills of lading signed by Brussels on 25th August 1924 (The Hague Rules) or The Hague Rules as amended by the protocol signed by Brussels on 23rd February 1968 (The Hague / Visby Rules). Nothing contained herein shall be deemed to be a surrender by the carrier of any of his rights or immunities or any increase of any responsibilities or liabilities under The Hague or Hague Visby Rules.

2)    Where The Hague, Hague / Visby or Hamburg rules are not compulsorily applicable to this bill of lading, the carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Article 1 to vl11 of The Hague rules, safe that the limitation sum for the purpose of article IV rule 5 of the Hague Rules shall be £100 sterling.

**U.S. ANTI-DRUG ABUSE ACT 1986 CLAUSE TO TIME CHARTERS:**

(a)    In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and



### RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
### CHARTER PARTY DATED 7TH AUGUST 2006

the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

(c) The Owners shall arrange for a precautionary survey to be undertaken in order to search for illegal substances on or about the vessel and the costs and any time lost shall be apportioned equally between the Owners and the Charterers.

Notwithstanding the content of paragraph (c) compulsory surveys are always to be for Charterers' time/expense.

### U.S. CUSTOMS TRADE PARTNERSHIP AGAINST TERRORISM (C-TPAT) CLAUSE

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

### U.S. SECURITY CLAUSE FOR TIME CHARTERING

If the vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:-



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"
CHARTER PARTY DATED 7TH AUGUST 2006**

Notwithstanding anything else contained in the Charter Party, all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

## WEST COAST OF SOUTH AMERICA TRADING

If, during the course of this Charter, Charterers consider trading the vessel to West Coast of South America, then Owners to be advised at earliest possible time of such intention. Mooring ropes/wires as on board but any additional mooring ropes/wires or other fittings required for trading to such areas/ports to be supplied and paid for by Charterers.

85.    Intermediate Hold Cleaning:

Upon completion of discharge of each intermediate cargo, ship's crew shall render all customary assistance to clean cargo compartments in preparation for their next employment. Whenever possible, all cleaning to be performed concurrent with discharge operations and/ or while vessel en-route to her next load port, weather, local regulations, trade union labour regulations and time permitting.

Charterers shall pay Owners USD 500 per hold for sweeping/ washing after discharge of all permitted cargoes. It is understood that crew will endeavour to do their best to clean holds but Owners/ crew not to be responsible if holds fail a cleanliness inspection due to residues attributable to cargoes carried under this Charter.

Charterers to arrange at their time, risk and expense for removal/ disposal of hold washing water, cargo garbage/residues if same not allowed to be disposed of or pumped overboard within territorial waters of that port/ country.

Removal/ disposal of cargo dunnage, separation materials and/ or fittings to be performed in Charterers' time and at their risk and expense. Fresh water and/ or chemicals and equipment (if required) for hold cleaning to be provided and paid for by Charterers.

Any delay, costs, consequences or action against Owners/ Vessel arising from cleaning between Australian ports to be entirely at Charterers' risk and expense.

86.    Gypsy Moth Clause:

The Charterers shall be responsible for the risks associated with and the consequences of trading the Vessel, during the currency of this charter, to ports or places designated by any competent authority as a risk in respect of exposure to contamination by Gypsy Moth larvae/ eggs/ insects or other ("Gypsy Moth Area"). In particular, during the currency of this charter, the Vessel shall remain on hire during any period of delay or detention suffered by the Vessel as a consequence of charterers trading the Vessel to a Gypsy Moth Area.



**RIDER CLAUSES TO M.V. "MARIA A ANGELICOUSSI"**
**CHARTER PARTY DATED 7TH AUGUST 2006**

Charterers shall indemnify and hold harmless Owners in respect of any liabilities, losses, damages or delay which they may sustain within a period of thirty (30) months following redelivery hereunder arising out of or in connection with Charterers trading the Vessel to a Gypsy Moth Area during the currency of the charter.



Ex. 2

F.H.S. C/P 07.08.2006

**M/V "MARIA A. ANGELICOUSSI" - TRANSFIELD ER C/P 07.08.2006**

| | | | | | OWNERS' |
|---|---|---|---|---|---|
| | PERIOD OF MINIMUM 59, to MAXIMUM 61 MONTHS' TRADING (5 YEARS), i.e. JULY to SEPTEMBER 2011 | | | | |
| VOY. : 22 | FIRST 2 YEARS at USD40,000.oo PER DAY | | | | |
| | BALANCE 3 YEARS at USD37,500.oo PER DAY | | | | |
| DELIVERY : | 8/15/2008 11:45 | UTC ("Z") | (DELIVERED, DLOSP DALIAN, P.R.C., in DIRECT CONTINUATION) | | |
| TO : | 8/14/2008 11:45 | UTC ("Z") | (REDELIVERED, ? - RANGEBOUND ) | | |
| ON HIRE : | 730.000000 | DAYS @ | $40,000.00 | PER DAY | $29,200,000.00 |
| | | | | | -$1,095,000.00 |
| | 3.75% ADDRESS COMMISSION | | | | |
| | 0.00% BROKERS' COMMISSION | (1.25 % - E. A. GIBSON SHIPBROKERS LTD.) | | | $0.00 |
| BOD IFO : | 1,675.5000 | MTS @ | $350.00 | PER MT | $603,000.00 |
| BOD MDO : | 159.5000 | MTS @ | $670.00 | PER MT | $106,865.00 | $709,865.00 |
| CREW P.M.P.R. : | | $1,500.00 | | | |
| NEW RATE | | | | OR, PER DAY : | $50.0000000 | $36,500.00 |
| DELIVERY : | 8/14/2008 11:45 | UTC ("Z") | (DELIVERED, DLOSP DALIAN, P.R.C., in DIRECT CONTINUATION) | | |
| TO : | 8/25/2010 11:45 | UTC ("Z") | (REDELIVERED, ? - RANGEBOUND ) | | |
| ON HIRE : | 680.000000 | DAYS @ | $37,500.00 | PER DAY | $25,500,000.00 |
| | | | | | -$956,250.00 |
| | 3.75% ADDRESS COMMISSION | | | | |
| | 0.00% BROKERS' COMMISSION | (1.25 % - E. A. GIBSON SHIPBROKERS LTD.) | | | $0.00 |
| CREW P.M.P.R. : | | | | OR, PER DAY : | $68.6666667 | $46,333.33 |
| *MSG 28/12/09 MECHANICAL PROBLEM VSL SAILED TO PORT ARUBA FOR REPAIRS* | | | | *off-hire agreed* | -$461,520.87 |

---

| MSG 23/9/10 - AS PER CHRTS PERF. CLAIM FM PONTA DO UBU TO ABU DHABI. TIME LOST 36.91 HOURS | | | | | |
|---|---|---|---|---|---|
| DAYS | 1.537916667 | DAYS @ | $37,500 | PER DAY | -$57,671.88 |
| | 2.75% ADRESS COMMISSION | | | | $2,182.70 |
| CREW P.M.P.R. : | | | | OR, PER DAY : | $0.0000 |
| IFO CONS : | -123.195 | MTS @ | 480.00 | | -$59,134.08 |
| MDO CONS : | 0.000 | MTS @ | 670.00 | | $0.00 |
| | | | | | -$114,643.26 |
| AS PER SOA 19/6/10 CHRTS WITHHELD \$ 114643.27-MSG 23/9/10 - AS PER CHRTS PERF. CLAIM FM PONTA DO UBU TO ABU DHABI. TIME LOST 36.91 HOURS | | | | | -$114,643.27 WITHHELD 18/4/10 |

| MSG 29/3/10 AS PER OWNERS - GRAND TTL \$74998.841D=\$24998.804 PLUS OVERCONSUMPTION FO 26,264 | | | | | |
|---|---|---|---|---|---|
| SOA 31/3/10 - AMENDED PERF. CLAIM 49.87HOURS) | | | | | |
| DAYS | 2.077916667 | DAYS @ | $37,500 | | -$77,921.88 | -$25,371.35 |
| | 3.75% ADRESS COMMISSION | | | | $2,922.07 | $973.00 |
| CREW P.M.P.R. : | | | | | -$138.53 | -$46.17 |
| IFO CONS : | -26.264 | MTS @ | 480.00 | | -$12,606.72 | -$12,606.72 |
| MDO CONS : | 0.000 | MTS @ | 670.00 | | $0.00 |
| | | | | | -$67,745.95 | -$37,050.30 | -$37,050.30 |

| AS PER SOA 19/4/10 PERF.CLAIM 6,42HOURS-MSG 31/3/10 ALLEGED LOSS OF TIME CLAIM AT FUJAIRA | | | | | |
|---|---|---|---|---|---|
| DAYS | 0.2675 | DAYS @ | $37,500 | PER DAY | -$10,031.25 |
| | 3.75% ADRESS COMMISSION | | | | $376.17 |
| CREW P.M.P.R. : | | | | OR, PER DAY : | |
| IFO CONS : | -0.270 | MTS @ | 480.00 | PER MT | -$129.60 |
| MDO CONS : | 0.000 | MTS @ | 670.00 | PER MT | $0.00 |
| | | | | | -$9,784.68 AWAITING COMMENTS |

---

*OrEXPS :*
*approved owners expenses* | | | | | -$3,437.12

AS PER SOA 23/9/09 DEDUCTED BUNKER DEMURRAGE AT ROTTERDAM(8-12/09)) | | | | | -$13,286.76 MSG 15/9+23/9 REJECTING IT

**CHRTRS' EXPS :**

| | | | |
|---|---|---|---|
| I. H. CLEANINGS | | | $117,000.00 |
| DN 29/03/07 (2394A) (o.c.s. 27.03.07) Stevedore Damages @ Money Point Holds Nr259 (\$700+\$2030) | | | $2,730.00 |
| DN 2765A 4/2/09 Omsg 6/2/09 ownser's invoice forwarded to chrts euro1858,72 rate 22/1/09(invoice) | | | 2,157.32 |
| DN 2847A 18/6/9 (o.c.si 4/8/09) msg 2/4/08 joint antinarcotic s/w inspection \$1500 | | PAID 15/6/09 | $750.00 |
| DN 2848A 18/6/9 (o.c.si 4/8/09) O.M. 234/09) re: RE-ISSUANCE OF BSE. AT TUBARAO LOCAL PANDI us£780,50- invoice fwrd to chrts | | PAID 15/6/09 | $780.30 |
| DN28824 ATTACHED INVOICE MSG 3/9/09-carried out 31/7/09-OM 212/09 - JOINT UWI TO BE CARRIED OUT BY AQUA PORT -USD 1500 50% | | | $750.00 |
| O.MSG INVOICE ATTACHED 24/12/09-O.M. 04-12-2009 UW CLEANING | | 2,149.00 € paid 11/1/10 | 32,614.47 |
| DN 2980A -152/10-(o.c.si 5/2/10-msg6/2/10)-O.M 137/10 ADDITIONAL INSURANCE K+R ABT NET 13000+ADDITIONAL INSURANCE PIRACY LOSS ABT NET 17000-INVOICE TO BE SENT TO CHRTS | | PAID 16/4/10 | 34,703.00 |
| DN 2980A -152/10-(o.c.si 5/2/10-msg6/2/10)-O.M 137/10 ADDITIONAL INSURANCE K+R ABT NET 13000+ADDITIONAL INSURANCE | | PAID 9/3/10 FM SWISSMARINE | 16,838.53 |
| DN 2986A 4/3/10 - MSG 4/3/10-O.M 131/10 CREW LABOUR RE COST OF | | PAID 9/3/10 FM SWISSMARINE | 2,761.00 |
| DN 2987A 5/3/10 - o.m. 132/10 Stevedore Damage Reports 1+2 (3/5/01) | | PAID 12/3/10 FM STEVEDORES | 7,751.00 |
| DN 2987A 5/3/10 - o.m. 5/2/10 attached Invoice msg 1/2/10 - chrts refuse to participate at inspection at Ponta Do Ubu | | PAID 12/3/10 FM STEVEDORES | 1,250.00 |
| DN 2982 3/3/10 - O.M. 24/2/10 ATTACHED INVOICE RE Class attendance @Port Prococo 25/9/09 for the instal. of bitts+chocks | | PAID 10/5/10 | 1,990.00 |
| DN 3017A - 85/10 MSG 21/4/10 CREW DISMANTLING AND STORING THE RAZOR WIRE AT ABU DHABI | | | 600.00 |
| MSG 6/5/10-ATTACHED-HULL DAMAGE - EXPECTING COST ESTIMATE EXPECTED FROM TECHNICAL | | SURVEY TO BE ATTACHED | 22,400.00 |

**CHARTERERS' REMITTANCES :**

| | | | | | |
|---|---|---|---|---|---|
| | | Hire collections - hire 1 to hire 48 | | | -$29,524,051.20 |
| | | Hire collections - hire 49 to hire 89 | | | -$21,105,937.28 |
| | 3/9/2010 | Hire Payment # 88 | | FM SWISSMARINE | -$19,599.03 |
| | 3/12/2010 | Hire Payment # 89 | | FM STEVEDORES EUROPEEN MASSAGET | -$7,735.00 |
| | 3/11/2010 | Hire Payment # 84 | | FM SWISSMARINE | -$33,614.43 |
| RCVD with V.D. : | 4/19/2010 | Hire Payment # 90 | | | -$177,295.44 |
| RCVD with V.D. : | 4/16/2010 | Hire Payment # 89 | | | -$312,080.00 |
| RCVD with V.D. : | 4/26/2010 | Hire Payment # 91 | | | -$542,383.25 |
| RCVD with V.D. : | 5/11/2010 | Hire Payment # 92 | | | -$388,870.00 |
| RCVD with V.D. : | 5/14/2010 | Hire Payment # 92 | | | -$172,406.25 |
| RCVD with V.D. : | 5/14/2010 | Hire Payment # 93 | | | -$541,573.54 |
| RCVD with V.D. : | 6/10/2010 | Hire Payment # 94 | | | -$429,330.00 |
| RCVD with V.D. : | 6/10/2010 | Hire Payment # 94 | | | -$114,330.25 |
| | | | | TOTAL DUE (OWNERS→ / CHRTRS→) | $750,944.66 |

E.& O.E.

**RECONCILIATION**

| | | |
|---|---|---|
| | | $750,944.66 |
| DN28824 ATTACHED INVOICE MSG 3/9/09-carried out 31/7/09-OM 212/09 - JOINT UWI TO BE CARRIED OUT BY AQUA PORT -USD 1500 50% | | 750.00 |
| MSG 28/7/09 CHRTS REJECT OUR REJECTION DN 2824A 24/4/09 (O.C.SL 1mth/09)REJECTED OrEXPS 1598,29 | | $1,598.29 |
| DN 2987A 5/3/10 - o.m. 5/2/10 attached Invoice-MSG 22/2/10 -4/2/10 CHRTS REJECTION-O.M. 27/1/10 JOINT ANTINARCOTIC TTL\$2500 | | $1,250.00 |
| msg 15/01 AS PER SOA 30/10- Re PERF CLAIMS CHRTS TOTAL-SEE ATTACHED HEREWITH LIST | | 635,238.27 |
| OrEXPS @ DAMPIER 27/5/07 & 6/6/09AS PER AGELEF'S SOA OK | | -$75.00 |
| UNRECONCILED DIFFERENCE | | |
| AS PER SOA 19/4/10 PERF.CLAIM 6,42HOURS AS PER CHRTS-MSG 31/3/10 ALLEGED LOSS OF TIMEOFFTIME CLAIM AT FUJAIRA | | $9,784.68 |
| DN 2980A -152/10-(o.c.si 5/2/10-msg6/2/10)-O.M 114643.27 AND PAY BACK ABSO 23/2/10 - AS PER CHRTS PERF. CLAIM FM PONTA DO UBU TO ABU DHABI- TIME LOST 36,91 HRS | | $77,039.11 |
| MSG 21/4/10 CREW DISMANTLING AND STORING THE RAZOR WIRE AT ABU DHABI | | 600.00 |
| MSG 6/5/10-ATTACHED-HULL DAMAGE - EXPECTING COST ESTIMATE EXPECTED FROM TECHNICAL | | $22,400.00 |
| BANK CHARGES (ACCUMULATED) on REMITTANCES , | | $1,501.01 |
| DIFFERENCE (owns exps) - HAVE REQUESTED BREAKDOWN | | 807.71 | $0.00 |